IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

TAMARA SIMMONS,                        )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )            CIVIL ACTION NO. 1:06-00542
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

M E M O R A N D U M   O P I N I O N

        This is an action seeking review of the decision of the Commissioner of Social Security

denying Claimant's application for Supplemental Security Income (SSI), under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on

Plaintiff's Motions to Remand (Doc. No. 11.) and to Submit Additional Evidence (Doc. No. 13.) and

Defendant's Motion for Judgment on the Pleadings. (Doc. No. 14.) Both parties have consented in

writing to a decision by the United States Magistrate Judge.

        The Plaintiff, Tamara Simmons (hereinafter referred to as "Claimant"), filed an application

for SSI on August 4, 2003, alleging disability as of January 1, 2001, due to difficulty following

instructions, knee problems, difficulty learning, possible brain damage from childhood, and obesity.[1]

(Tr. at 13, 111, 62, 69.) The claim was denied initially and upon reconsideration.  (Tr. at 62-64, 69-

---

        [1] Claimant previously filed an application for SSI on October 25, 2001, alleging disability
as of July 2, 2001, due to being a slow learner. (Tr. at 13, 51.) The claim was denied initially and
upon reconsideration. (*Id.*) Following an administrative hearing on March 26, 2003, Claimant's
Application was denied by an Administrative Law Judge, the Honorable Charles R. Boyer, on April
11, 2003. (Tr. at 13, 51-58.) Claimant sought no further action. Accordingly, the ALJ found that the
doctrine of *res judicata* barred consideration of Claimant's disability status from July 2, 2001,
through May 26, 2005. (Tr. at 14.)

71.)  On April 1, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ).

(Tr. at 74.)  A hearing was held on January 20, 2005, before the Honorable Brian P. Kilbane.  (Tr.

at 24-45.) By decision dated May 26, 2005, the ALJ determined that Claimant was not entitled to

benefits. (Tr. at 13-22.) The ALJ's decision became the final decision of the Commissioner on June

7, 2006, when the Appeals Council denied Claimant's request for review.  (Tr. at 4-7.)  On July 6,

2006, Claimant brought the present action seeking judicial review of the administrative decision

pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has

the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which . . . can be expected to last for a

continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims.  20 C.F.R. § 416.920 (2003).  If an individual is found "not disabled" at any step,

further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether

a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant

is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).

If a severe impairment is present, the third inquiry is whether such impairment meets or equals any

of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id.

§ 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the

fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.

20 C.F.R. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of

2

disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).   The burden then shifts to the

Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth

and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity,

considering claimant's remaining physical and mental capacities and claimant's age, education and

prior work experience.  20 C.F.R. § 416.920(f) (2003).  The Commissioner must show two things:

(1) that the claimant, considering claimant's age, education, work experience, skills and physical

shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in

the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must

follow a special technique at every level in the administrative review process." 20 C.F.R. §§

404.1520a(a) and 416.920a(a).[2] First, the SSA evaluates the claimant's pertinent symptoms, signs

and laboratory findings to determine whether the claimant has a medically determinable mental

impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those

sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional
> limitations is a complex and highly individualized process that requires us to
> consider multiple issues and all relevant evidence to obtain a longitudinal picture of
> your overall degree of functional limitation. We will consider all relevant and
> available clinical signs and laboratory findings, the effects of your symptoms, and
> how your functioning may be affected by factors including, but not limited to,
> chronic mental disorders, structured settings, medication and other treatment.
>     (2) We will rate the degree of your functional limitation based on the extent

---

[2] As noted above, these Regulations were substantially revised effective September 20, 2000.
*See* 65 Federal Register 50746, 50774 (August 21, 2000).

3

to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since her alleged onset date. (Tr. at 15.) Under the second inquiry, the ALJ found that Claimant suffered from borderline intellectual functioning, which impairment was severe. (Tr. at 16-17, 21.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17.)  The ALJ then found that Claimant had the residual functional capacity to perform light work as follows:

---

continued need for such an arrangement.

> [T]o lift and carry 25 pounds frequently and 50 pound[s] occasionally, can never climb ropes, ladders, and scaffolds, can occasionally climb stairs, balance, kneel, crouch, crawl, must avoid temperature extremes of cold, or work around moving machinery and heights. Due to IQ scores in the 68-79 range, the [C]laimant is limited to unskilled simple, rote work.

(Tr. at 18-19.) At step four, the ALJ concluded that Claimant could not return to her past relevant work. (Tr. at 19, .) Nevertheless, on the basis of Vocational Expert ("VE") testimony, the ALJ concluded that Claimant could perform jobs such as a food prep/kitchen worker, silver wrapper, and food counter, which exist in significant numbers in the national economy. (Tr. at 20.) On this basis, benefits were denied. (Tr. at 21-22.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on October 26, 1970, and was 34 years old at the time of the administrative hearing. (Tr. at 19, 28.) Claimant had high school education and participated in special education classes and modified curricula. (Tr. at 226, 231, 274-75.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ's assessment of Claimant's borderline intellectual functioning and IQ scores is ambiguous and (2) the vocational expert's testimony is inconsistent with the Dictionary of Occupational Titles. (Pl.'s Br. at 2-5.) The Commissioner asserts that these arguments are without merit and that the ALJ's decision is supported by substantial evidence. (Def.'s Br. at 6-10.)

1. Listings 12.05C and 12.05D.

Claimant first argues that the ALJ erred in finding that Claimant's IQ scores ranged between 68 and 79. (Pl.'s Br. at 3.) Rather, Claimant asserts that the ALJ was required to find explicitly Claimant's IQ score. (Id.) Furthermore, Claimant argues that the range of 68 to 79 is inconsistent with the ALJ's finding that Claimant was of borderline intellectual functioning. (Id.) Claimant asserts that this range is deceptive because if she actually falls between 68 and 70, she should have been determined disabled under Listing 12.05C or 12.05D, mental retardation. (Id.) This ambiguity, Claimant asserts, therefore requires that this matter be remanded to determine a valid IQ score. (Id. at 3.) The Commissioner asserts that Claimant's argument is without merit and that the ALJ's

decision is supported by substantial evidence of record. (Def.'s Br. at 6-8.)

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R § 416.925(a) (2006). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment  before age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2006). Additionally, in order to meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2003).[4]

The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. U.S. Dept. of Health & Human Servs., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one

---

[4] Likewise, Listing 12.05D requires the deficits in adaptive functioning, as well as

[a] valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence or pace; or
4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05D (2003).

8

"which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R.

§ 416.920(c) (2003).  In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of the requirement of § 12.05C.  Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities.  The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of § 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999) (defining mental retardation as "significantly subaverage intellectual quotient with related limitations in two or more of the following: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.").[5] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. Id. at 40. Thus, although Claimant appears to argue that

---

[5] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning.  Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

Listings 12.05C and 12.05D are two-part tests, consisting only of the requisite IQ scores and the additional requirement, the Regulations make clear that both contain a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

The Commissioner has asserted in other cases that section 12.05C is a three-part test, with the introductory paragraph ("significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period") being the threshold requirement. Although the Fourth Circuit has not addressed this issue after the amendment to the Regulations, other Circuits have held that a claimant must meet the "deficits in adaptive functioning requirement" to meet all of the criteria for Listing 12.05C. See, e.g., Higgins v. Barnhart, 288 F. Supp. 2d 811 (S.D. Tex. 2002) (claimant failed to display adaptive functioning deficits despite requisite IQ scores); Burrell v. Commissioner, 2000 WL 1827799 (6th Cir. Dec. 8, 2000) (receiving benefits under 12.05 also requires a deficit in adaptive functioning). In Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992), the Eleventh Circuit held as follows:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05C when the claimant presents a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities. This court, however, has recognized that a valid IQ score need not be conclusive of mental retardation where the IQ score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.

(internal citations omitted).   This Court too, has followed this approach. See Slaughter v. Barnhart, 1:03-0058, March 29, 2004 Order, Doc. No. 18.

Accordingly, despite evidence of the requisite IQ scores and the additional severe impairment of borderline intellectual functioning, the ALJ nonetheless found that Claimant did not meet Listing 12.05C because there was no evidence of adaptive deficits prior to age 22.[6] (Tr. at 17.) Likewise, the lack of evidence of adaptive deficits prior to age 22 would preclude a finding that Claimant met Listing 12.05D. The ALJ noted that Claimant testified that she drove, lived alone, took care of her personal needs, shopped, cooked for herself and others, did her own laundry and cleaned her house daily. (Tr. at 17.) The evidence does not indicate that Claimant had significant deficits in adaptive functioning. With regard to daily activities, Claimant reported that she lived alone, shopped, cooked, cleaned house, did laundry, watched television, attended church on a regular basis, and played the piano for three different churches. (Tr. at 17.) Claimant testified that she graduated from high school and had been in special education classes, but was able to read and write. (Id.) In several psychological evaluations, providers determined that Claimant had borderline intellectual functioning, not mental retardation. (Tr. at 237, 259, 280, 283.) One provider provisionally diagnosed Claimant as suffering from mental retardation, which was contingent upon the receipt of Claimant's educational records to determine whether she suffered adaptive deficits prior to the age of 22. (Tr. at 229.) The record contains no indication that this provisional diagnosis was confirmed.

---

[6] Claimant's educational records, submitted in connection with his appeal to the Appeals Council, contains the following IQ scores: Verbal IQ of 48, Performance IQ of 60, and Full Scale IQ of 49. (Tr. at 311.) These scores alone suggest that Claimant may suffer from mental retardation. Nevertheless, as the ALJ found, the record does not contain and Claimant has not produced any evidence of adaptive deficits. Accordingly, the IQ scores contained in Claimant's educational records are of no moment to the ALJ's analysis.

The Court finds support in the ALJ's decision that Claimant's adaptive functioning is not impaired. The ALJ's decision that Claimant did not meet or equal Listing 12.05C or 12.05D for mental retardation is supported by substantial evidence and there is no ambiguity between Claimant's IQ scores and her borderline intellectual functioning. Consequently, any error that the ALJ may have committed in not stating one IQ score is harmless because the evidence of record supported the diagnosis and severe impairment finding of borderline intellectual functioning.

2. <u>Ability to Perform Other Work</u>.

Claimant next argues that given her IQ range of 68 to 79, the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. at 9-10.) Specifically, Claimant notes that her IQ scores, as determined by the ALJ, would place her in the bottom ten percent of the population. (<u>Id.</u> at 9.) The VE however, identified the jobs of a kitchen helper, silver wrapper, and food counter worker, as ones which her RFC permitted her to perform. (<u>Id.</u>) Claimant asserts that pursuant to the <u>DOT</u>, these jobs require aptitudes in the middle to lowest one-third of the population. (<u>Id.</u>) Consequently, the VE's testimony conflicts with the <u>DOT</u> and Claimant asserts that this matter must be remanded for clarification. (<u>Id.</u> at 5.) The Commissioner asserts that pursuant to Social Security Ruling ("SSR") 00-4p, the <u>DOT</u> "lists the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." (Def.'s Br. at 9.) The Commissioner therefore, asserts that a VE "may be able to provide more specific information about jobs or occupations than the DOT." (<u>Id.</u> at 9-10.) Consequently, the Commissioner argues that assuming the maximum requirements listed in the DOT are greater than Claimant's IQ scores, there is no conflict because Claimant has the ability to perform simple, rote, repetitive tasks and her level of functioning is sufficient such that she has cared for at least one

elderly gentleman in the past. (Id. at 10.)

The Regulations provide that work exists in the national economy "when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. §§ 404.1566(b) and 416.966(b) (2006). Although the regulations cite the DOT as one of several sources of which the Commissioner may take administrative notice in  determining whether jobs exist in the national economy, the regulations do not *require* the Commissioner to identify jobs from the DOT that exist in the national economy in significant numbers. 20 C.F.R. §§  404.1566(d)(1) and 416.966(d)(1) (2002); Warf v. Shalala, 844 F. Supp. 285, 290 (W.D. Va. 1994) ("The regulation does not indicate that the DOT is binding on the ALJ or that he is bound by the 'definitional requirements' for the various jobs.")  Indeed, the regulations state that "[i]f the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist." §§ 404.1566(e) and 416.966(e).

As to conflicts between the DOT and vocational expert testimony, in an unpublished opinion by the Fourth Circuit, the court, citing Conn v. Secretary of Health & Human Servs., 51 F.3d 607, 610 (6th Cir. 1995), found that substantial evidence supported the ALJ's decision that the claimant could perform a significant number of jobs in the national economy, even when the DOT and vocational expert testimony were in conflict.  Sawyer v. Apfel, 166 F.3d 1210, 1210 (4th Cir. 1998). The Court reasoned that the regulations do not require the Commissioner or the vocational expert to rely on classifications in the DOT. Id. Thus, even if this is an instance where the DOT and vocational testimony conflict, it does not merit remand.

13

Finally, substantial evidence supports the ALJ's finding that Claimant can perform the jobs of kitchen helper, silver wrapper, and food counter worker. The ALJ found Claimant capable of light work involving unskilled, simple, rote tasks. (Tr. at 19.) The hypothetical question posed by the ALJ included these limitations and in response, the vocational expert identified the jobs of kitchen helper, silver wrapper, and food counter worker. (Tr. at 20, 42-43.) Additionally, the ALJ's hypothetical question included the fact that the individual had various IQ scores and borderline intellectual functioning. (Tr. at 42.) The Court notes, however, that Claimant does have the basic ability to read and write. Based upon the foregoing, Claimant's argument is without merit.

3. Claimant's Motion to Submit Additional Evidence.

Along with her Brief, Claimant filed a Motion to Submit Additional Evidence on October 10, 2006. (Doc. No. 13.) Claimant asserts that the documents which she wishes to submit are enclosed. (Id.) Claimant states:

> Enclosed documents were the reasons the plaintiff gave at the Appeals Council level. However, if one looks at the transcript it is not with Request for Review of Hearing at transcript page 9, nor is it with the attachments found on page 313 through 334 which were the exhibits sent with said Request.

(Id.) The Court finds that the documents also are neither with Claimant's Motion to Submit Additional Evidence, Motion to Remand, nor her Brief in support. Because Claimant has failed to provide the Court with a copy of the proposed documents, the Court is constrained to deny her Motion.

After careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, for the reasons set forth in this Memorandum Opinion and by the Judgment Order entered this day, the Plaintiff's Motions to Remand (Doc. No. 11.) and to Submit Additional Evidence (Doc. No. 13.) are **DENIED**,

Defendant's Motion for Judgment on the Pleadings (Doc. No. 14.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 28, 2007.

R. Clarke VanDervort
United States Magistrate Judge